IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

TERRY MACK SMITH, ID # 207465,    )
        Petitioner,              )
                                 )
vs.                               )         No. 3:06-CV-1626-N (BH)
                               )             ECF
NATHANIEL QUARTERMAN, Director,  )    Referred to U.S. Magistrate Judge
Texas Department of Criminal       )
Justice, Correctional Institutions Division,  )
        Respondent.         )

**FINDINGS, CONCLUSIONS, AND RECOMMENDATION
OF THE UNITED STATES MAGISTRATE JUDGE**

Pursuant to the provisions of 28 U.S.C. § 636(b), and an Order of the Court in implementation thereof, subject cause has previously been referred to the United States Magistrate Judge. The findings, conclusions, and recommendation of the Magistrate Judge are as follows:

## I. BACKGROUND

### A. Nature of the Case

Petitioner, an inmate currently incarcerated in the Texas Department of Criminal Justice - Correctional Institutions Division (TDCJ-CID), filed the instant petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 to challenge a June 28, 2004, conviction for aggravated assault with a deadly weapon in Cause No. F04-00497-WL. Respondent is Nathaniel Quarterman, Director of TDCJ-CID.

### B. Procedural and Factual History

The State indicted petitioner for aggravated assault with a deadly weapon. (Trial Transcript at 2). Petitioner pled not guilty to the charged offense and was tried before the court on June 25 and June 28, 2004. (*Id.* at 17).

At the guilt phase of the trial, the State called Marie Reddick as a witness. Reddick testified

that she used to date petitioner, and that on March 6, 2003, petitioner came to her apartment at around 1:30 or 1:45 p.m. When she answered the door, petitioner demanded to know what had taken her so long to answer the door, and he began searching the apartment to see if anyone else was there. Reddick told petitioner that no-one else was in her home and asked him what his problem was. Petitioner replied that she was the one who had a problem and punched her in the face with his fist, causing her to pass out. When she regained consciousness, petitioner took her into the bathroom and told her to clean her face off because she was bleeding. When her eye would not stop bleeding, petitioner told her to take her clothes off and get in the bathtub, which she did. All the while, he was cursing at her and saying that she had made him hit her and that there would not have been a problem if she had given him a key to her apartment. Petitioner then took her out of the bathtub to her bedroom and pushed her down on the bed, where she passed out again. After she awoke, petitioner asked her if she needed anything from the store. Although she knew that she was injured, she told him that she only needed BC powder. Petitioner eventually left after telling her to lie still and not move. Reddick's friend Linda Evans later came to the apartment, and Reddick asked her to call an ambulance. As a result of the attack, Reddick suffered two fractures to her face, the orbital bone under her eye was shattered, and she still needed to have surgery because one eye hung down lower than the other. (R. 1:14-26).

On cross-examination, Reddick stated that petitioner came by her house almost every day. She denied that he ever gave her money for her rent. On March 17, 2003, she went to the location where he used to live to locate him so she could call the police, and the couple who lived there told her he was married. Petitioner had told Reddick that he rented a room from an older woman, Vesha Smith. Reddick went to see his parole officer to tell her about the assault. She acknowledged that

2

she left a message on an answering machine at Smith's house in which she was yelling at petitioner, and that petitioner would bring the tape by her apartment and play it for people. Reddick denied ever yelling at petitioner from a car, but she admitted that her friend Delilah had done so. Reddick maintained that she knew petitioner had come to her house between 1:00 and 2:00 p.m. on the day of the attack because Jerry Springer was on the television in the background. She had changed the locks on her apartment a few weeks earlier because petitioner had a key. (R. 1:27-52). Reddick maintained that Jerry Springer was on at 1:00 p.m. even when shown a TV guide showing that Jerry Springer was on at 12:00. Reddick also denied ever telling petitioner that she would "get even" with him for not giving her money.

On re-direct, Reddick testified that petitioner came to her house for sex most days after he dropped Vesha Smith off at work at Love Field in the morning. Reddick further testified that petitioner had been violent with her in the past, including knocking her down and holding a knife to her throat. A neighbor once called the police, and they came and gave Reddick a report number after speaking to her. Reddick testified that she stayed at a domestic violence halfway house for over a month after petitioner assaulted her on March 6, 2003, and she was given the safety action plan that was admitted into evidence. (R. 1:232-281).

Linda Evans also testified for the State. She testified that she was Reddick's neighbor and good friend. She further testified that on March 6, 2003, she went to Reddick's apartment between 12:00 and 1:00 p.m. When Reddick let her inside, she saw that Reddick's eye was messed up. Evans asked Reddick what happened, and Reddick said that petitioner had hit her. Reddick then asked Evans to call an ambulance for her. Evans further testified that when she left to call for an ambulance, she saw petitioner around the corner, watching Reddick's apartment. (R. 1:58-60).

Officer William Price testified that he was the detective who investigated this case. (R. 1:66-7). Three photographs of Reddick were admitted into evidence at the trial. In these photographs, Reddick was lying in a hospital bed with an injury to her right eye. (R. 1:25, State's Ex. #1-3).

Numerous witnesses testified for the defense. Freddie Barken testified that he owned an automotive shop, that petitioner came to that shop around 11:00 or 11:30 a.m. on March 6, 2003, for an estimate to repair his car, and that the estimate took about an hour. The undated estimate was placed into evidence, as was a note Barken wrote several says later setting out what occurred on March 6, 2003. (R. 1:71-76). Tommie Gardner testified that she lives across the street from petitioner and his wife, Vesha, and that on March 6, 2003, she saw petitioner working in his yard from 12:45 p.m. to at least 3:30 p.m. (R. 1:77-80). Mareshei Delaney testified that she was petitioner's parole officer and that petitioner was an excellent parolee. When Reddick reported the alleged assault to her, she smelled alcohol on Reddick's breath, and Reddick rejoiced when Delany told her that petitioner would be arrested. Delaney also testified that Reddick seemed to be angry at petitioner because he was married to another woman, not because she had been assaulted by him. (R. 1:84-90). Ross Dixon testified that he was petitioner's friend, and that a couple of weeks before petitioner turned himself on the assault charge, he saw Reddick in line at a church food pantry where Dixon volunteers. Dixon heard petitioner tell Reddick that he could not afford to help her with her rent, and Reddick told petitioner that she would "get even" with him. (R. 1:101-108). Vesha Smith testified that she has worked at Southwest Airlines for twelve years, and that she and petitioner met at church, began dating in October of 2002, and married in January of 2003. (R. 1:109-111). Smith further testified that an unidentified woman called her in November of 2002 and told her that petitioner would never marry her. On January 29, 2003, a message was left on her answering

machine from a woman who identified herself as Marie Reddick. Reddick seemed angry and belligerent, stating that petitioner was engaged to several other people, all of the women he was dating should meet for coffee, petitioner did not love anyone but himself, and he was not assisting either Reddick or Smith financially. Smith also testified that on March 26, 2003, a person called her on Reddick's behalf and asked how petitioner was doing, and whether Smith still saw him. Finally, Smith testified that on March 18, 2003, she assisted petitioner in getting statements from people who saw him on March 6, 2003. (R. 1:113-117).

Petitioner testified about his medical disabilities and his academic and job history. He was convicted of murder in 1969, paroled in June of 2002, and began dating Reddick in July of 2002. Petitioner gave her money to help with her expenses because she did not work and because he stayed at her home occasionally. He did not like the people who would hang out at Reddick's home because he did not drink or do drugs as they did. Reddick drank. Petitioner testified that he and Reddick were engaged but subsequently broke up, and he moved out of her apartment in September 2002. In October 2002, he began dating Vesha Smith. Petitioner kept a key to Reddick's place and would take her brother-in-law to the store to cash his disability checks. He claimed that Reddick stalked him after they broke up, and that she called in February 2003 and told him that she would have him sent back to prison because he was not helping her financially. At her request, he went to her house to help her brother-in-law on March 3, 2006. The next day, on March 4, Reddick called to ask him for rent money and cursed at him; she later called back and apologized. On March 5, Reddick and Evans came by the food pantry where he volunteered, and Reddick again asked why he had not helped her financially. Petitioner denied that he was ever at Reddick's home on March 6th, maintaining that he did not see her again until March 12th, when she hollered at him from a

car at the food pantry. Petitioner also gave detailed testimony regarding his whereabouts on March 6, 2003: leaving home at 6:30 a.m. to help with a plumbing problem at church; visiting his parole officer at 9:00 a.m.; going to the auto shop at a little after 11:00 a.m.; staying there for 40-45 minutes; returning home close to 1:00 p.m.; and working in the yard. (R. I:122-173).

On cross-examination, Petitioner denied that he was moved while in jail on the assault charge because of altercations with other inmates. He also denied that he ever told Reddick's friend, Delilah Murray, that he would have Reddick killed if she pressed charges on him. (R. 1:186-89). In addition, three members of petitioner's church and two people who worked for the Texas Workforce Commission testified about petitioner's positive character traits. (R. 1:191-229).

The court found petitioner guilty and sentenced him to twenty-five years imprisonment. (Trial Transcript at 17). Petitioner filed an appeal challenging the legal sufficiency of the evidence. The Fifth District Court of Appeals affirmed petitioner's conviction in an unpublished opinion. *Smith v. State*, No. 05-04-01034-CR (Tex. App. – Dallas, June 2, 2005, no pet.). On May 24, 2006, petitioner filed a state application for writ of habeas corpus in which he raised the same issues that he raises in his federal petition (State Habeas Transcript at 7-8). The Court of Criminal Appeals denied petitioner's state application without written order on the findings of the trial court without an evidentiary hearing. *Ex parte Smith*, No. 06,001-02, slip op. at 2 (Tex. Crim. App. Aug. 16, 2006).

On September 5, 2006, petitioner filed the instant petition for federal habeas relief. (*See* Pet. Writ of Habeas Corpus (Pet.) at 1). Respondent filed an answer on January 31, 2007, (*see* Answer) and provided the state court records. Petitioner filed a response to that motion on March 5, 2007. (*See* Pet. Smith's Rebuttal [hereinafter Reply]).

## A. Substantive Issues

Petitioner asserts that: (1) trial counsel provided ineffective assistance of counsel; (2) there was prosecutorial misconduct because the State presented perjured testimony from the complainant; and (3) he is falsely and illegally imprisoned because he was convicted solely based on hearsay evidence and his prior record (Pet. at 7, 12). Petitioner also requests an evidentiary hearing.

## B. Exhaustion

Respondent does not contend that petitioner failed to exhaust any of his claims.

## II. APPLICABLE LAW

Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. 104-132, 110 Stat. 1217, on April 24, 1996. Title I of the Act applies to all federal petitions for habeas corpus filed on or after its effective date. *Lindh v. Murphy*, 521 U.S. 320, 326 (1997). Because petitioner filed the instant petition after its effective date, the Act applies to his petition.

Title I of AEDPA substantially changed the way federal courts handle habeas corpus actions. Under 28 U.S.C. § 2254(d), as amended by AEDPA, a state prisoner may not obtain relief

> with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim —
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

"In the context of federal habeas proceedings, a resolution (or adjudication) on the merits is a term of art that refers to whether a court's disposition of the case was substantive, as opposed to procedural." *Miller v. Johnson*, 200 F.3d 274, 281 (5th Cir. 2000). In this case, the denial of petitioner's

state writ constitutes an adjudication on the merits.  *See Ex parte Thomas*, 953 S.W.2d 286, 288-89 (Tex. Crim. App. 1997) (holding that a denial, rather than a dismissal, signifies an adjudication on the merits).  Thus, the AEDPA standards enumerated in 28 U.S.C. § 2254(d) apply.

Section 2254(d)(1) concerns pure questions of law and mixed questions of law and fact. *Martin v. Cain*, 246 F.3d 471, 475 (5th Cir. 2001).  A decision is contrary to clearly established federal law, within the meaning of § 2254(d)(1), "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts."  *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000).

With respect to the "unreasonable application" standard, *Williams* instructs that a writ must issue "if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case."  *Id.* at 413; *accord Penry v. Johnson*, 532 U.S. 782, 792 (2001).  Likewise under *Williams*, a state court unreasonably applies Supreme Court precedent if it "unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply."  529 U.S. at 407.  "[A] federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable."  *Id.* at 409; *accord Penry*, 532 U.S. at 793.

Section 2254(d)(2) concerns questions of fact.  *Moore v. Johnson*, 225 F.3d 495, 501 (5th Cir. 2000).  Under § 2254(d)(2), federal courts "give deference to the state court's findings unless they were 'based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.'"  *Chambers v. Johnson*, 218 F.3d 360, 363 (5th Cir. 2000).  The resolution

of factual issues by the state court is presumptively correct and will not be disturbed unless the state prisoner rebuts the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

## III. INEFFECTIVE ASSISTANCE OF COUNSEL

In his first claim for relief, petitioner asserts that he received ineffective assistance of counsel at trial because defense counsel failed to object to hearsay testimony, failed to properly investigate each witness, failed to raise the defense that the complainant had a history of fabricating stories, and misled petitioner into believing that a trial before the judge was the best avenue for him. (Pet. at 7).

To successfully state a claim of ineffective assistance of counsel, petitioner must demonstrate (1) that counsel's performance was deficient and (2) that the deficient performance prejudiced his defense. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984). To determine whether counsel's performance is constitutionally deficient courts "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable assistance." *Strickland*, 466 U.S. at 689. Further, "[t]he reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions." *Id.* at 691. A failure to establish either prong of the *Strickland* test requires a finding that counsel's performance was constitutionally effective. *Id.* at 696.

To establish prejudice, a petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. The prejudice component of the *Strickland* test "focuses on the question whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair." *Williams v. Taylor*, 529 U.S. 362, 393 n.17 (2000) (citations and internal quotation marks omitted).

Petitioner first argues that his trial counsel was ineffective for failing to object to hearsay

testimony given by Reddick. Petitioner does not, however, specify testimony by Reddick to which his attorney should have objected. Reddick gave her own direct, first-hand testimony about the assault for which petitioner was convicted and the injuries she sustained. Defense counsel was not deficient for failing to raise a meritless objection to this testimony. *See Emery v. Johnson*, 139 F.3d 191, 198 (5th Cir. 1997). Moreover, the record from petitioner's trial reveals that defense counsel did object to Reddick's testimony on other issues on several occasions, including on the basis that it was hearsay. (*See* R. 1:18, 24, 243, 245, 247). More importantly, where a defendant is tried by a judge instead of a jury, the judge is presumed to disregard inadmissible evidence and rest his verdict on admissible evidence. *See United States v. Cardenas*, 9 F.3d 1139, 1154 (5th Cir. 1993). Indeed, at one point after defense counsel objected to Ms. Reddick's testimony on the basis that it was hearsay, the trial judge commented that he want to get the "whole picture" and that he would make the determination as to what was and was not hearsay. (R. 1:247). Petitioner therefore has failed to show either that his attorney was deficient in this regard or that he was prejudiced.

Petitioner next argues that his trial counsel was ineffective for failing to properly investigate each witness and for failing to raise the complainant's history of fabricating stories as a defense. Petitioner again does not specify which witnesses were not properly investigated or what information could have been presented to support his assertion that the complainant fabricated stories. The record from the trial reveals that petitioner testified under oath that his attorney had subpoenaed and called all of the witnesses that he wished to call to testify on his behalf. (R. 1:12, 297). The record further shows that defense counsel vigorously cross-examined the complainant regarding her history with petitioner, including money he might have provided her, her anger at the fact that he married another woman, and her phone calls to his residence and cell phone. Counsel also

10

impeached the complainant's testimony with her testimony from both the grand jury proceedings and the protective order hearing. (R. 1:27-56, 232-38, 281-90, 294-96). The record does not support petitioner's claim that counsel was deficient for not properly investigating witnesses or for not presenting the defensive theory that the complainant was fabricating the assault charge.

Finally, petitioner asserts that his attorney was ineffective because she misled him into believing that a trial before the court was the best avenue for him to take. Under questioning from the judge, however, petitioner stated that he understood that he had the right to a jury trial, that he did not want a jury trial, that he had signed the waiver of a jury trial document freely and voluntarily, and that no one had promised him anything for signing the document. (R. 1:7-8). Defense counsel also questioned petitioner directly under oath about his decision to waive a jury trial, and he testified that it was his decision to have a trial before the court rather than a jury and to decline the State's offer of two years' imprisonment. After the case had been continued, petitioner once again opted for a bench trial. Petitioner also testified that his attorney was handling his case in the manner he had asked her to. (R. 1:10-12). The record therefore does not support petitioner's assertion that he was misled into waiving a jury trial by his attorney. For the foregoing reasons, petitioner's claims of ineffective assistance of counsel entitle him to no habeas relief.

## IV. PROSECUTORIAL MISCONDUCT

In his second claim, petitioner argues that the State committed prosecutorial misconduct because the prosecution offered the complainant's perjured testimony at his trial.

The Supreme Court has held that the presentation of false evidence at trial, as well as the admission into evidence at trial of false evidence that, although not solicited, is not corrected, violates a criminal defendant's due process rights, if the reliability of a given witness may be

determinative of guilt or innocence. *Napue v. Illinois*, 360 U.S. 264, 269 (1959); *Mooney v. Holohan*, 294 U.S. 103 (1935). This is true whether the nondisclosure was intentional or through negligence. *Giglio v. United States*, 405 U.S. 150, 154 (1972). In order to prevail on a claim that his constitutional rights were violated by the presentation of false testimony, however, a petitioner must establish not only that the testimony was actually false, but also that it was material and that the prosecution knew it was false. *Napue v. Illinois*, 360 U.S. at 271.

In the case at hand, the only evidence that petitioner offers to support his assertion that the complainant's testimony was false is his own assertion that it was false because it differed from his testimony. Petitioner has therefore not shown that the complainant gave perjured testimony. *See Koch v. Puckett*, 907 F.2d 524, 531 (5th Cir. 1990) (holding that conflicting testimony does not prove perjury but instead establishes a credibility question). Moreover, the fact that the complainant and petitioner gave very different versions of events at trial is not evidence that the State knew that the complainant gave perjured testimony. *See Kutzner v. Cockrell*, 303 F.3d 333, 337 (5th Cir. 2002) (holding that the fact that false or perjured testimony is challenged by other evidence presented at trial or is inconsistent with prior statements does not establish that the prosecution knew or believed that testimony to be false). Petitioner has not shown that there was any prosecutorial misconduct, and this claim therefore entitles him to no habeas relief.

## V. ILLEGAL SENTENCE

In his third ground for relief, petitioner asserts that his sentence is illegal because it is based on a conviction obtained through the use of hearsay testimony and his prior record. In essence, petitioner appears to argue that he is illegally confined because the trial judge believed the complainant's version of events, rather than his own. Petitioner is in effect arguing that the

evidence is insufficient to support his conviction under *Jackson v. Virginia*, 443 U.S. 307, 320 (1979).

Under *Jackson*, "the assessment of the credibility of witnesses is generally beyond the scope of review." *Schlup v. Delo*, 513 U.S. 298, 330 (1995). Courts view "any required credibility determinations in the light most favorable to the guilty verdict." *United States v. Wise*, 221 F.3d 140, 154 (5th Cir. 2000). They do not "second-guess[] the weight or credibility given the evidence." *United States v. Ramos-Garcia*, 184 F.3d 463, 465 (5th Cir. 1999). Thus, this Court is not at liberty to second-guess the trial judge's credibility determinations.

Petitioner also provides an affidavit from Freddie Barken, the automobile shop owner who testified at trial. In this affidavit, dated June 29, 2007, Freddie Barken states that on March 6, 2003, petitioner came into his job at about ten minutes until noon to have his car inspected and get a written estimate on his car, and that he was in the shop for forty to forty-five minutes. (*See* Pet. Motion to Amend, ex. #1). This new affidavit, however, directly contradicts both Mr. Barken's and petitioner's testimony at trial. Bracken testified that petitioner arrived at his shop at 11:00 or 11:30 a.m. and stayed for about an hour, and petitioner testified that he arrived at the shop a little after 11:00 a.m. and was there for forty to forty-five minutes. (R. 1:73, 165). This affidavit does not lend credibility to Petitioner's argument, and he is not entitled to relief on this claim.

## VI. STATE CONSIDERATION OF CLAIMS

Petitioner raised his claims in his state writ. The Court of Criminal Appeals denied the state writ on the findings of the trial court, and thus petitioner's claims were adjudicated on the merits. This decision at the state level is consistent with applicable Supreme Court precedent. The decision involved no unreasonable application of Supreme Court precedent. The adjudication of the claims did not result in a decision that was based upon an unreasonable determination of the facts in light

of the evidence presented to the state court. Under applicable Supreme Court standards and the

AEDPA standards, petitioner is entitled to no habeas relief on the claims raised in the instant

petition.

## VII. EVIDENTIARY HEARING

Upon review of the petition and answer filed herein and the proceedings held in state court

as reflected in the state-court records, an evidentiary hearing appears unnecessary.

## VIII. RECOMMENDATION

For the foregoing reasons, the undersigned Magistrate Judge **RECOMMENDS** that the

Court **DENY** with prejudice the request for habeas corpus relief brought pursuant to 28 U.S.C. §

2254.

**SIGNED** on this 20th day of October, 2008.

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

## INSTRUCTIONS FOR SERVICE AND
## NOTICE OF RIGHT TO APPEAL/OBJECT

The United States District Clerk shall serve a copy of these findings, conclusions, and recommendation on all parties by mailing a copy to each of them. Pursuant to 28 U.S.C. § 636(b)(1), any party who desires to object to these findings, conclusions and recommendation must file and serve written objections within ten days after being served with a copy. A party filing objections must specifically identify those findings, conclusions, or recommendation to which objections are being made. The District Court need not consider frivolous, conclusory or general objections. Failure to file written objections to the proposed findings, conclusions, and recommendation within ten days after being served with a copy shall bar the aggrieved party from appealing the factual findings and legal conclusions of the Magistrate Judge that are accepted by the District Court, except upon grounds of plain error. *Douglass v. United Servs. Auto Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996) (*en banc*).

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE